IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Jennie Smallwood, | ) | No. CIV 04-393-TUC-CKJ (HCE) |
| Plaintiff, | ) | **REPORT & RECOMMENDATION** |
| vs. | ) | |
| Jo Anne B. Barnhart,<br>Commissioner of Social Security, | ) | |
| Defendant. | ) | |

Plaintiff Jennie Smallwood has filed the instant action seeking review of the final decision of the Commissioner of Social Security pursuant to 42 U.S.C. § 405(g). This Social Security Appeal has been referred to the United States Magistrate Judge pursuant to the Rules of Practice of this Court.

Pending before the Court are Plaintiff's Motion for Summary Judgment and Defendant's Motion for Remand. For the following reasons, the Magistrate Judge recommends that the District Court, after its independent review, grant Plaintiff's Motion for Summary Judgment and deny Defendant's Motion for Remand.

PROCEDURAL HISTORY

On January 14, 2001, Plaintiff submitted to the Social Security Administration a Disability Report. (TR. 68-77) Plaintiff alleged a disability onset date of November 13, 2000

due to "extreme pain" in her shoulders, neck and cervical spine.  (TR. 69) She stated that her shoulders, neck, and cervical spine "first bother[ed]" her in 1997.  (Id.) Plaintiff also suffers from diabetes, depression, high blood pressure, and osteoarthritis.  (TR. 74, 83)  On January 16, 2001, Phyllis Dugger, who interviewed Plaintiff on behalf of the Social Security Administration, determined that Plaintiff had the "[p]rotective filing date" of January 4, 2001.  (TR. 78) Additionally, on February 5, 2001, Plaintiff submitted an application for Disability Insurance Benefits.  (TR. 58-60) Plaintiff was "insured for benefits through the date of" the Administrative Law Judge's November 11, 2002 opinion.  (TR.21; see also  TR 61("DIS DLI 12/02"))

Plaintiff's application was initially denied "for insufficient evidence available to provide [Plaintiff]...with a reasonable determination" because Plaintiff and certain medical providers failed to respond to requests for additional information.  (TR. 35)  Plaintiff filed a request for reconsideration of the denial.  (TR. 38) Upon receipt of Plaintiff's request for reconsideration, the Social Security Administration considered additional information received since its initial denial and again denied Plaintiff's request for benefits, this time finding that Plaintiff's "condition is not severe enough to keep [her]...from working."  (TR. 40-43)

Plaintiff then requested a hearing and the matter was heard by the Honorable Frederick J. Graf ("ALJ") on September 11, 2002.  (TR. 44-45, 350-369)   Plaintiff was represented by counsel at the hearing and was the only person to testify.  On November 11, 2002,  the ALJ issued his decision finding that Plaintiff was not disabled as defined by the Social Security Act.  (TR. 16-22)

Plaintiff requested that the Appeals Council review the ALJ's decision.  (TR. 11) On June 4, 2004, the Appeals Council denied Plaintiff's request for review thereby rendering the ALJ's decision the final decision of the Commissioner.  (TR. 5-7)

THE RECORD ON APPEAL

    Plaintiff's statements in the record

        Plaintiff was born on January 31, 1954.  (TR. 58) In November 2002, when the ALJ ruled on Plaintiff's claims, Plaintiff was 48 years of age.  (TR. 16) Plaintiff was married from 1975 until her husband's death in 1996.  (TR. 58) Plaintiff lives with her sons, mother, and brother.  (TR. 85)  Plaintiff completed high school and one year of college.  (TR. 75)

        Plaintiff's work history began in 1986 when she worked part-time as a sales clerk. (TR. 70) In 1993, Plaintiff left that job to care for her husband, who was ill.  (TR. 356) After her husband's death in 1996, Plaintiff returned to work in 1997 as a customer service representative for an emergency roadside service, which she continued to do until February 1999.  (Id.; TR. 70) From June 1999 to January 2000, she worked as a customer service representative for a mail-order company.  (Id.)  From February 2000 to November 2000, Plaintiff once again worked as a customer service representative for a roadside assistance company.  (Id.)  Her responsibilities at the roadside assistance company included answering calls from people whose vehicles had broken down, "you took all their information and then you call a tow truck and have their vehicles towed in.  So you sit at a computer and take calls."  (TR. 356) Plaintiff found that she "couldn't actually do the job anymore.  I used to work full-time, and when I started having so much problems with [my] neck and my shoulders and stuff...I can't sit...for a long period at a time, or stand or anything like that." (TR. 357)  Plaintiff reduced her work hours in an effort to cope with the pain.  (TR. 357; *see also* TR. 69-70) She also had to leave work several times due to pain.  (TR. 69; *see also* TR. 357-358)  She ultimately discontinued work in November 2000 because of "intense pain" in her neck and arms and numbness in her arms and fingers.[1]  (TR. 357) Plaintiff describes her

---

[1] Plaintiff has indicated that her pain first began to bother her in 1997.  (TR. 69) The record reflects that in 1996, Plaintiff was involved in a motor vehicle accident.  (TR. 299) Plaintiff felt achiness and stiffness, although she did not seek medical attention.  (Id.)  Then in 1997, after she began working, Plaintiff developed right arm and shoulder problems.  (Id.)

pain  as "like taking a blowtorch to the back of my neck, going down the neck, and the arms." (Id.) If she moves her arms a certain way, "intense pain shoots in neck and arms." (TR. 82) She feels "constan[t] pain down the back of [her] neck–across [her] shoulders and down [her] arms to [her] hands and now [the pain] radiates to [her] lower back." (Id.)  The pain "radiates all the way down my spine." (Id.)

Plaintiff testified that even though she is no longer working, she is still in constant pain and her pain has become worse. (TR. 358) She is unable to sleep through the night because she is "up and down" with the pain. (Id.)The pain "gets more intense as time goes on, and I find that the more movement I do, the more I hurt." (Id.) She does not do any bending, lifting or reaching above her head. (Id.) The pain prevents Plaintiff from performing "simple, everyday task[s] that I have done all my life without hurting." (TR. 83) For example, at times her mother has to assist Plaintiff with clasping her bra and Plaintiff has difficulty washing her own hair because she must lift her arms up to do this. (TR. 84) Further, Plaintiff does not "lift over a gallon of milk, and that hurts." (TR. 364) Her son assists her with lifting. (Id.) Although Plaintiff does her own shopping, she requires assistance taking items to her car and loading her car. (Id.)

Plaintiff is unable to sit or lie for long periods of time, she can stay in one position for only fifteen or twenty minutes before having to move. (TR. 358) Also, Plaintiff is unable to button and unbutton things because of numbness in her hands and fingers. (TR. 363) Although Plaintiff drives, she can only drive short distances and she has "a little problem getting in and out...I don't turn my head...like you usually do.  I have to turn my whole body, like, if I back up or anything like that.  I can't just turn my head and look." (TR. 86, 365)

Plaintiff does experience some increased movement in her neck after she has completed physical therapy, such as water therapy, however, that relief lasts only for three to four hours. (TR. 359)

Plaintiff also suffers from depression, which began when her husband was ill. (TR. 360) She attended therapy in the past. (Id.) Since approximately 2000, she has been taking

Paxil and Valium.  (Id.; *see also* TR. 366)  Plaintiff's depression causes her to be very emotional and not to have a social life.  (TR. 361) She has anxiety attacks and has problems dealing with stress.  (TR. 361-362)  During stressful situations at work, Plaintiff cried and got to the point where she "just want[ed] to ram my head into a wall."  (TR. 362) At especially stressful times Plaintiff had to call on her supervisor to take over so that Plaintiff could go outside.  (TR. 363)  Plaintiff's depression also interfered with her ability to concentrate and to meet certain quotas at work.  (Id.) Plaintiff also finds it stressful "not to be able to do what I was used to doing."  (TR. 362) Plaintiff has not returned to therapy because she cannot afford the co-pay amount.  (TR. 361)

In addition to taking Paxil and Valium for depression and anxiety, Plaintiff also takes insulin and other medication for diabetes, Avapro for high blood pressure, Vioxx for her neck and back, Allegra for allergies, and Premarin because she had a hysterectomy.  (TR. 366; *see also* TR. 97) Although  Plaintiff "stay[s] tired all the time," she does not know whether this is a result of her medication or her medical conditions. (TR. 366)

For Plaintiff's daily activities, she takes medication, gets dressed, naps, and sometimes she goes to the store where she requires assistance with lifting.  (TR. 84-86) She is no longer able to read because diabetes has affected her sight.  (TR. 86) Plaintiff used to enjoy bowling but she is no longer able to do this because she cannot lift the ball.  (Id.)

<u>Medical Evidence</u>

<u>Plaintiff's Physicians</u>

On January 6, 2000, Plaintiff saw neurologist Lloyd Anderson, M.D., for symptoms related to her shoulder and cervical spine.  (TR. 244-245) Dr. Anderson found that Plaintiff had weakness in her upper extremities, he diagnosed Plaintiff with cervical pain, and he ordered diagnostic studies.  (TR. 245)

On March 7, 2000, magnetic resonance imaging ("MRI") of the cervical spine showed:

1.      Congenitally small spinal canal.

2.      Moderate to severe spinal canal stenosis at C5-6[2] and C6-7...
3.      No abnormal signal within the spinal cord.

(TR. 164) Although Plaintiff's narrowing of the spinal canal made contact with her spinal cord, no compression appeared to occur. (Id.)

On April 10, 2000, Gabriel Gonzales-Portillo, M.D., a neurosurgeon and an assistant professor of neurosurgery at the University of Arizona Health Sciences Center, examined Plaintiff on referral from Dr. Anderson. (TR. 240) Dr. Gonzales-Portillo stated that the MRI of Plaintiff's cervical spine showed "a disc herniation on the left at C4/5 and C5/6." (Id.) He also stated that Plaintiff's deep tendon reflexes were hypoactive throughout. (Id.) Because Plaintiff had "been trying physical therapy with good results," he recommended that she continue with same. (Id.) "[I]f she deteriorates, she needs to come back to see me so that we can discuss surgical options." (Id.)

The record also reflects an April 10, 2000 Consultation Sheet completed by Aubrey Ziegler, M.D., internal medicine at Davis Monthan Air Force Base, and directed to "physical therapy" in which Dr. Ziegler wrote: "pt saw spine surgery [sic] who recommended surg. Pt prefers PT. Has tried PT here, without success, would like to try PT at university." (TR. 160; *see also* TR. 157 (referring to "Dr. Ziegler"); TR. 158 (identifying Davis Monthan Air Force Base))

On June 19, 2000, Plaintiff visited Dr. Gonzales-Portillo again. (TR. 155) Dr. Gonzales-Portillo's progress notes reflect that Plaintiff "was placed in physical therapy with good results. She tells me now that she can move her neck better...We are very pleased with her progress." (Id.) Dr. Gonzales-Portillo referred Plaintiff for additional physical therapy. (Id.)

On October 30, 2000, Plaintiff saw Ronald Bernstein, M.D., regarding her pain and numbness. (TR. 269) Dr. Bernstein reviewed Plaintiff's March 2000 MRI and found "C4-C5 and C5-6 disc disease where the ------ appears to be a left-sided acute disc herniation and the

---

2"C" indicates "cervical."

latter appears to be a much more chronic spondylitic area."[3]   (Id.)   Upon examination of

Plaintiff, Dr. Bernstein found "significant weakness in" Plaintiff's right upper extremities.

(Id.)  Dr. Bernstein recommended an electromyogram ("EMG") study "before considering

any type of surgical intervention  because of her metabolic disease.  I have discussed several

of the options which would include continuing with conservative care versus the possibility

of an anterior cervical discectomy and interbody fusion."  (Id.)

A November 1, 2000 Radiologic Examination Report of Plaintiff's C-Spine flexion

and extension studies included the following findings:

> A small osteophyte was present at the anterior portion of the superior end-plate
> of C5.  Uncovertebral joint narrowing and associated osteophytes were present
> at C4/5 on the left and bilaterally at C5/C6 and C6/C7.  These osteophytes
> produced moderate narrowing of the left C4/C5 and C5/C6 neural foramina
> and mild narrowing otherwise.  No abnormal translatory motion occurred with
> flexion or extension.  There was no perivertebral soft tissue swelling.

(TR. 266-267)

The Impression was:

> 1.    Mild changes of degenerative disc disease at the C5/C6 level.
> 2.    Multilevel uncovertebral joint osteoarthritis with neural foraminal
>       narrowing as described above.

(TR. 267)

A December 19, 2000 EMG of Plaintiff's upper extremities was normal.  (TR. 120-

121; TR. 268) There was "[n]o evidence of cervical radiculopathy bilaterally or peripheral

neuropathy of upper extremities."  (Id.)

On January 2, 2001, Dr. Bernstein reviewed Plaintiff's "flexion/extension x-rays, as

well as the previous diagnostic studies.  They confirm foraminal compromise at C4-5 and

C5-6 on the left side where she continues to have her severe cervical radiculopathy.  There

does not appear to be any true subluxation, however, or instability."  (TR. 265) Dr. Bernstein

concluded that Plaintiff "continues to demonstrate signs and symptoms of a cervical

radiculopathy.  I have reviewed the EMG/NCV study which fails to reveal any evidence of

---

[3]The dashes appearing in the quotation also appear in Dr. Bernstein's record.  (TR.
269)

peripheral neuropathy consistent with her hypertension, diabetes or smoking." (Id.) Dr. Bernstein recommended surgery involving "a two level anterior cervical discectomy, interbody fusion and internal fixation." (Id.) He further indicated that Plaintiff wished to proceed with the surgery "as soon as possible." (Id.)

On February 26, 2001, Plaintiff once again saw Dr. Gonzales-Portillo. Dr. Gonzales-Portillo noted that since he had last seen Plaintiff in June of 2000, her "pain is worse now, as it goes to both upper extremities. This is associated with numbness and tingling. She states the pain is a 10 on a scale from 1-10." (TR. 275) Dr. Gonzales-Portillo also stated that "[i]n about November [2000], she went to see another neurosurgeon who advised her to undergo surgery. Fortunately, her insurance did not work with that surgeon and she is back here for follow-up." (Id.) Dr. Gonzales-Portillo's review of Plaintiff's MRI revealed "L[4]-sided herniated disc between 4/5, as well as central diffuse disc bulge at C5/6 and a small C6/7 disc herniation, but with deformation of spinal cord." (Id.) Because Plaintiff had multiple risk factors, including diabetes, Dr. Gonzales-Portillo recommended that she "exhaust the conservative therapy first" and he referred her to a pain clinic. (Id.) Dr. Gonzales-Portillo also stated that "if she needs surgery, she is going to need a 2-level (4/5, 5/6). I explained to her that her third disc at 6/7 may get worse and eventually she may need to have this removed." (Id.)

On May 7, 2001, Mitchell Halter, Ph.D., M.D., and Bennett Davis, M.D.,[5] evaluated Plaintiff at the Pain Management Clinic, University of Arizona Health Sciences Center. (TR. 277) Upon a musculoskeletal examination of Plaintiff, Dr. Halter's and Dr. Davis' findings included:

---

[4]"L" indicates "lumbar."

[5]The report reflects that Dr. Halter "dictat[ed] for" Dr. Davis and that Dr. Davis "was present for all key portions of the history and physical exam...[and that Dr. Davis] dictated to Dr. Halter the plan as outlined above." (TR. 281)

severely decreased range of motion with cervical flexion and extension. Left rotation is also severely decreased. Right rotation is limited to 45°...Maneuvers that produce upper cervical extension with lower cervical flexion are painless. Maneuvers that produce upper cervical flexion with lower cervical extension are extremely painful for the patient. Cervical axial compression is tender to the patient, but does not reproduce typical pain. She has no pain relief with cervical distraction. There is a bilaterally positive Roos test. There are bilaterally negative Spurling maneuvers. Palpation and percussion of the cervical spine is diffusely tender. There is no tenderness to palpation or percussion to the thoracic, lumbar and sacral spine. There is full range of motion at the left shoulder girdle. The right shoulder girdle has decreased range of motion with endpoint abduction and with extending posteriorly with the arm in the inferior position. There is also decreased endpoint internal range of motion. There is preserved range of motion at the hip girdle.

(TR. 279) The Doctors' Assessment included:

1.    Nonfocal neurologic examination.
2.    Cervical hypomobility, lower.
3.    Functional thoracic outlet syndrome.

(TR. 280)

Plaintiff stated during the examination by Doctors Halter and Davis that she "did not desire any pain medication therapy. She feels that she takes enough medications...for her underlying diseases and is not inclined to add to this medication burden." (Id.) The Doctors recommended that Plaintiff "continue to use pain medication on an intermittent basis" and they suggested that the OxyContin be discontinued because it "is not a particularly good medication for incidental pain. She says that she does not require pain medications on a daily basis, but may need this up to several times a week at night. If the Tylenol #3 are effective for her, then this would be adequate coverage." (Id.)

The Doctors recommended physical therapy for Plaintiff's "cervical dysfunction." (Id.) In the event that physical therapy was not successful, then cervical epidural steroids should be considered. (Id.)

On February 8, 2002, Plaintiff again saw Dr. Anderson. (TR. 240) She complained of pain and numbness and tingling in her face, neck, and upper and lower extremities. (Id.) Dr. Anderson diagnosed:

1.    Sensory disturbance
2.    Depression

- 9 -

3.      Anxiety

(TR. 340)

On May 22,  2002, Plaintiff underwent a hysterectomy.  (*See e.g.* TR.321-324) Records associated with this procedure indicate that Plaintiff "complained of some chronic back pain...and was unable to flex her hips appropriately to perform a total vaginal hysterectomy.  Options were discussed...The patient agreed to start with a total abdominal hysterectomy."  (TR. 322)

Also in May 2002, an MRI of Plaintiff's cervical, thoracic, and lumbar spines revealed "[b]ulge[d] and degenerated disks at C5-C6 and C6-C7 without much progression since the last study."  (TR. 314) Additionally, at C5-C6, the canal diameter is narrowed and C4-C5 showed mild foraminal stenosis visible on the left.  (TR. 316) The MRI also revealed "a [s]mall disk bulge...at T10-T11[6] and T11-T12...[b]ulging disk with annular tear at T12-L1. Spinal stenosis at L4-L5 with narrowed cross-sectional canal area."  (TR. 315)

On June 24, 2002, Dr. Anderson reviewed the May 22, 2002 MRI in addition to examining Plaintiff.  (TR. 325) He diagnosed cervical radiculopathy and lumbar pain.  (Id.) He recommended that Plaintiff follow up with "neuorsurgery for eval. cervical radiculopathy." (Id.)

On August 16, 2002, Dr. Anderson completed a Medical Work Tolerance Recommendations form regarding Plaintiff. (TR. 346-347) Dr. Anderson assessed Plaintiff's functional limitations as follows:

- Plaintiff could not work full time; instead, she could perform less than two hours of sedentary work per day;
- she could sit for one hour at a time and for two hours during a work day;
- she could stand for five to ten minutes at one time and for two hours during a work day;
- she could walk for five minutes at one time and for one hour in a work day;
- she would need to change positions from sitting to standing or walking at least once per hour;
- she should avoid bending, crouching, and kneeling;
- she could occasionally work with her arms extended in front;

---

[6]"T" indicates "thoracic."

- she could occasionally use her hands for fine movements such as typing; and
- she could occasionally reach above shoulder level.

(Id.)

### State-Agency Consultative and Non-Examining Physicians

On September 14, 2001, psychiatrist Hunter Yost, M.D., performed a consultative psychiatric examination of Plaintiff in connection with her claim of disability. (TR. 282-284) Dr. Yost's diagnoses was:

| | |
|---|---|
| AXIS I: | Major depression with moderate features. |
| AXIS II: | No diagnosis. |
| AXIS III: | Obesity, adult onset diabetes, high blood pressure and herniated discs in neck. |
| AXIS IV: | No structured daily activities, social support with family. |
| AXIS V: | Current GAF of 45 to 55. |

(TR. 283)  Dr. Yost summarized his findings as follows:

> [Plaintiff] has a very limited set of activities at this time.  She is receiving some benefit from the Paxil, yet has very little interest in socializing or pursuing any productive activities.  She performed well on the cognitive exam and did not show any deficits.  It has been over five years since she worked Her job skills are limited.  She was able to follow simple directions without a problem.  She also mentions that her energy is extremely low during the day.

(TR. 283)

On September 19, 2001, Russell Martin, M.D., a non-examining state-agency psychiatrist, determined that Plaintiff's depression was not "severe." (TR. 285) He did find that Plaintiff had a "mild" degree of limitation with regard to difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace.  (TR. 295)

On October 19, 2001, Scott Krasner, M.D., whose specialty is occupational medicine, performed a consultative examination at the request of the state agency in connection with Plaintiff's disability claim.  (TR. 299-301)  Dr. Krasner noted Plaintiff's complaints of neck and shoulder pain.  (TR. 299) "She feels that 'like someone's put me in a vice.' She has pains going down her left arm with some numbness.  She also has some pains in her lower back and her right shoulder." (Id.)  Dr. Krasner's examination "show[ed] some tenderness and pain with range of motion of her neck and back.  There is [sic] limitations to range of motion

- 11 -

of her right shoulder.  There is no objective evidence of radiculopathy.  Due to the tenderness noted and limitations to her right shoulder, this will have some effect on her functional capabilities especially when it comes to use of her right upper extremity."  (TR. 300-301). Dr. Krasner recommended the following functional work restrictions:

1.     No lifting over 50 pounds maximum or repetitively over 25 pounds.
2.     No pushing or pulling over 75 pounds.
3.     No use of the right arm over shoulder level.
4.     No restrictions on standing, walking or sitting.

(TR. 301).[7]

An October 30, 2001 Physical Residual Functional Capacity Assessment form completed by James Stagg, M.D., a non-examining state-agency physician, reflects that Dr. Stagg disagreed in part with Dr. Krasner's recommended work restrictions.  (TR. 302-309) Dr. Stagg stated that Plaintiff could lift up to 20 pounds occasionally and up to 10 pounds frequently.  (TR.303)  Dr. Stagg concluded that Plaintiff could perform a limited range of "light" work, including a limited ability to reach with her right arm.  (TR. 302-309; *see also* 20 C.F.R. § 404.1567(b) (defining "light" work)).  Dr. Stagg noted Dr. Krasner's recommendation but he nonetheless found that "[c]onsidering pain factor and objective findings a lower R[esidual] F[unctional] C[apacity] (light) is suggested as appropriate." (TR. 308) Dr. Stagg also noted that although the pain management specialist "advised interim physical therapy. [Plaintiff] has not undergone this therapeutic approach to date."  (Id.)

The ALJ's Findings

In the November 11, 2002 decision denying Plaintiff's application for benefits, the ALJ made the following findings:

1.     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

---

[7]Dr. Krasner thus believed that Plaintiff could perform medium work.  *See* 20 C.F.R. § 404.1567(c) (defining "medium" work).

2.      The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.      The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 CFR § 404.1520(b).

4.      These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.      The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

6.      The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 404.1527)

7.      The claimant retains the residual functional capacity to perform sedentary work as discussed in the body of the decision.

8.      The claimant's past relevant work as customer service representative did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

9.      The claimant's medically determinable pain in the neck, shoulders and cervical spine, diabetes, and depression do not prevent the claimant from performing her past relevant work.

10.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

***

It is the decision of the Administrative Law Judge that based on the application protectively filed on January 4, 2001, the claimant is not entitled to a period of disability or Disability Insurance Benefits under Sections 216(i) and 223, respectively, of the Social Security Act.

(TR. 21-22)

        In reaching his conclusion, the ALJ cited the reports by Doctors Bernstein, Gonzales-Portillo, Halter and Davis  as well the reports from state-agency Doctors Krasner and Yost. (TR. 20-21) He also cited the March 7, 2000 MRI of Plaintiff's cervical spine, Plaintiff's November 6, 2000 radiological study, and the December 19, 2000 EMG.  (TR. 18) Absent from the ALJ's discussion was any reference to Dr. Anderson's August 16, 2002 Medical Work Tolerance Recommendations.

- 13 -

Based upon his review of the records cited in his decision the ALJ "conclud[ed] that [Plaintiff] has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace and no episodes of decompensation."  (TR. 20) The ALJ further found that Plaintiff was "not totally credible" regarding her subjective complaints of pain.  (Id.)  Although the ALJ "realize[d] that...[Plaintiff] has some problems due to her limitations," he found that these difficulties  were "not as severe as alleged."  (Id.)

The ALJ further stated:

> The undersigned is aware of the opinion of the State agency physicians and agrees with their determination that claimant can return to her past relevant [sic].  They noted that although the evidence showed that the claimant had limited range of motion in the right shoulder she could still lift and carry lighter objects.  Her condition should not significantly affect her ability to sit, stand or walk for extended periods of time.  While the claimant had some symptoms of stress from time to time, it would not significantly affect her ability to work.  Based on the description of the job she performed as a customer service representative, the claimant could return to her past relevant work.  The undersigned has been persuaded by the opinion of the State agency physicians.  Their opinion is entitled to significant weight.

(TR. 20-21) According to the ALJ, Plaintiff is able to perform her past relevant work as a customer service representative, which the ALJ determined required Plaintiff, among other things, "to sit for seven and one-half hours and write, type, or handle small objects."  (TR. 21)

ARGUMENT

Plaintiff argues that the substantial evidence in the record does not support the ALJ's decision because the ALJ failed to provide clear and convincing reasons for rejecting treating neurologist Dr. Anderson's opinions.  Plaintiff points out that the ALJ failed to discuss Dr. Anderson's Medical Work Tolerance Recommendations which showed that Plaintiff was unable to work full time and could only occasionally type.  (Plaintiff's Motion for Summary Judgment, p. 8 citing TR. 346-347) Therefore, according to Plaintiff, "[b]ecause the ALJ did not provide the required clear and convincing reasons for rejecting Dr. Anderson's opinions, those opinions are credited as true."  (Id. at p. 9 citing *Lester v. Chater,* 81 F.3d 821, 834 (9th

Cir. 1996)).  Further according to Plaintiff, if Dr. Anderson's opinion is credited as true, then the record would support the conclusion that Plaintiff could not return to her past work as a customer service representative, as the ALJ found.  (Id. at p. 9)  Moreover, the record would also support the conclusion that Plaintiff could not  perform any full time work and, thus, Plaintiff would be entitled to disability benefits. (Id.)  Therefore, Plaintiff urges the Court to direct an award of benefits in her favor.  (Id. *citing Benecke v. Barnhart,* 379 F.3d 587, 593 (9th Cir. 2004); *McCartey v. Massanari,* 298 F.3d 1072, 1076-1077 (9th Cir. 2002)). Alternatively, Plaintiff requests that the Court reverse the ALJ's decision and order the matter remanded for evaluation of Dr. Anderson's opinions.

Additionally, Plaintiff points out that although the ALJ relied on the state-agency physicians for the conclusion that she could return to her past work, Dr. Stagg's opinion does not support such a finding.  (Id. at p. 12) Indeed, Dr. Stagg found that Plaintiff "had a limited ability to reach [in all directions ] with her right arm (TR. at  305)....Because [Plaintiff's] past relevant work as a customer service representative required typing (TR. at 65), that job required her to have her arms extended in front of her.  Since Dr. Stagg stated that [Plaintiff] could not reach (TR. at 305), Dr. Stagg's opinion does not justify the ALJ's finding."  (Id.)

Plaintiff also argues that the ALJ failed to evaluate whether Dr. Yost's opinion restricting Plaintiff "to simple work precluded the performance of her past relevant work as a customer service representative...The ALJ did not determine the mental demands of [Plaintiff's] past relevant work as a customer service representative...This was error."  (Id. at pp. 12-13) Plaintiff contends that her past work as a customer service representative "was more demanding than simple work."  (Id. at p. 13)

Plaintiff also contends that the ALJ improperly evaluated her credibility, especially in light of Dr. Anderson's objective medical findings and the fact that surgery was recommended.  (Id. at pp. 10-11)

Defendant concedes that "the ALJ did not consider the August 16, 2002 report of Dr. Anderson."  (Defendant's Brief in Support of Motion for Remand ("Defendant's Motion"),

p. 2) Therefore, Defendant requests that the Court "remand this action for further administrative proceedings in order to allow an ALJ to consider Dr. Anderson's report." (Id.) Because Defendant "agrees that the decision should be vacated," Defendant states that "Plaintiff's remaining arguments are moot." (Defendant's Surreply, p.1)

STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 423(d)(1)(A), an insured individual is entitled to disability insurance benefits if he or she demonstrates, through medically acceptable clinical or laboratory standards, an inability to engage in substantial gainful activity due to a physical or mental impairment that can be expected to last for a continuous period of at least twelve months. The Ninth Circuit has stated that "'a claimant will be found disabled only if the impairment is so severe that, considering age, education, and work experience, that person cannot engage in any other kind of substantial gainful work which exists in the national economy.'" *Penny v. Sullivan,* 2 F.3d 953, 956 (9th Cir. 1993) (*quoting Marcia v. Sullivan,* 900 F.2d 172, 174 (9th Cir. 1990)).

To establish a *prima facie* case of disability, the claimant must demonstrate an inability to perform his or her former work. *Gallant v. Heckler*, 753 F.2d 1450, 1452 (9th Cir. 1984). Once the claimant meets that burden, the Commissioner must come forward with substantial evidence establishing that the claimant is not disabled. *Fife v. Heckler*, 767 F.2d 1427, 1429 (9th Cir. 1985).

Pursuant to 42 U.S.C. §405(g), the findings of the Commissioner are conclusive and courts may overturn the decision to deny benefits "only if it is not supported by substantial evidence or it is based on legal error." *Matney v. Sullivan,* 981 F.2d 1016, 1019 (9th Cir. 1992)(citations omitted). Therefore, the Commissioner's determination that a claimant is not disabled must be upheld if the Commissioner applied the proper legal standards and if the record as a whole contains substantial evidence to support the decision. *Clem v. Sullivan*, 894 F.2d 328, 330 (9th Cir. 1990) (citing *Desrosiers v. Secretary*, 846 F.2d 573, 575-76 (9th Cir. 1988); *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983)). Substantial evidence is

defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Jamerson v. Chater,* 112 F.3d 1064, 1067-68 (9th Cir. 1997); *Winans v. Bowen,* 853 F.2d 643, 644 (9th Cir. 1988). However, substantial evidence is less than a preponderance. *Matney,* 981 F.2d at 1019. A denial of Social Security benefits will be set aside if the Commissioner fails to apply proper legal standards in weighing the evidence even though the findings may be supported by substantial evidence. *Winans,* 853 F.2d at 644.

The Commissioner, not the court, is charged with the duty to weigh the evidence, resolve material conflicts in the evidence and determine the case accordingly. *Id.* However, when applying the substantial evidence standard, the court should not mechanically accept the Commissioner's findings but should review the record critically and thoroughly. *Day v. Weinberger*, 522 F.2d 1154 (9th Cir. 1975). Reviewing courts must consider the evidence that supports as well as detracts from the examiner's conclusion. *Id*. at 1156. Moreover, "if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Matney,* 981 F.2d at 1019

In evaluating evidence to determine whether a claimant is disabled, the opinions of treating physicians are entitled to great weight. *Magallanes v. Bowen,* 881 F.2d 747, 751 (9th Cir. 1989). However, even a treating physician's opinion is not necessarily conclusive on either the issue of a physical condition or the ultimate issue of disability. *Id.* When resolving a conflict between the opinion  of a treating physician and that of an examining physician, the opinion of the treating physician is entitled to greater weight and may be rejected only on the basis of findings setting forth specific legitimate reasons based on substantial evidence of record. *Magallanes,* 881 F.2d at 751. Moreover, the Commissioner may reject the treating physician's uncontradicted opinion as long as the Commissioner sets forth clear and convincing reasons for doing so. *Magallanes*, 881 F.2d at 751.

Further, when medical reports are inconclusive, questions of credibility and resolution of conflicts in the testimony are functions solely of the Commissioner. *Magallanes,* 881 F.2d at 751 (citations omitted). However, the Commissioner's finding that a claimant is less than

credible must have some support in the record.  *See  Light v. Social Security Administration,*
119 F.3d 789 (9th Cir. 1997); *see also Connett v. Barnhart,* 340 F.3d 871 (9th Cir. 2003).

<u>DISCUSSION</u>

Disability claims are evaluated pursuant to a five-step sequential process.  20 C.F.R.
§§404.1520, 416.920; *Baxter v. Sullivan,* 923 F.2d 1391, 1395 (9th Cir. 1991).  The first step
requires a determination of whether the claimant is engaged in substantial gainful activity.
20 C.F.R. §§ 404.1520(b), 416.920(b).  If so, then the claimant is not disabled under the Act
and benefits are denied.  *Id.*  If the claimant is not engaged in substantial gainful activity, the
ALJ then proceeds to step two which requires a determination of whether the claimant has
a medically severe impairment or combination of impairments.  20 C.F.R. §§ 404.1520(c),
416.920(c).  In making a determination at step two, the ALJ uses medical evidence to
consider whether the claimant's impairment more than minimally limited or restricted his or
her physical or mental ability to do basic work activities.  *Id.*  If the ALJ concludes that the
impairment is not severe, the claim is denied.  *Id.*  Upon a finding of severity, the ALJ
proceeds to step three which requires a determination of whether the impairment meets or
equals one of several listed impairments that the Commissioner acknowledges are so severe
as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d), 416.920(d); 20 C.F.R.
Pt. 404, Subpt. P, App.1.  If the claimant's impairment meets or equals one of the listed
impairments, then the claimant is presumed to be disabled and no further inquiry is
necessary.  If a decision cannot be made based on the claimant's then current work activity
or on medical facts alone because the claimant's impairment does not meet or equal a listed
impairment, then evaluation proceeds to the fourth step.  The fourth step requires the ALJ
to consider whether the claimant has sufficient residual functional capacity ("RFC")<sup>8</sup> to
perform past work.  20 C.F.R. §§ 404.1520(e), 416.920(e).  If the ALJ concludes that the
claimant has RFC to perform past work, then the claim is denied.  *Id.*  However, if the

---

<sup>8</sup>Residual functional capacity is defined as that which an individual can still do despite her
limitations.  20 C.F.R. § 404.1545.

claimant cannot perform any past work due to a severe impairment, then the ALJ must move to the fifth step, which requires consideration of the claimant's RFC to perform other substantial gainful work in the national economy in view of claimant's age, education, and work experience. 20 C.F.R. §§ 404.1520(f). 416.920(f).  At step five, in determining whether the claimant retained the ability to perform other work, the ALJ may refer to Medical Vocational Guidelines ("grids") promulgated by the SSA. *Desrosiers,* 846 F.2d at 576-577. The grids are a valid basis for denying claims where they accurately describe the claimant's abilities and limitations. *Heckler v. Campbell,* 461 U.S. 458, 462, n.5 (1983).  However, because the grids are based on exertional or strength factors, where the claimant has significant nonexertional limitations, the grids do not apply. *Penny,* 2 F.3d at 958-959; *Reddick v. Chater,* 157 F.3d 715, 729 (9th Cir. 1998). Where the grids do not apply, the ALJ must use a vocational expert in making a determination at step five. *Desrosiers,* 846 F.2d at 580.

Whether this action should be remanded for an award of benefits or, instead, remanded for further administrative proceedings

Although the parties agree that the ALJ erred when he failed to consider Dr. Anderson's opinions, the parties disagree as to how the Court should resolve this action in light of that error.  Plaintiff argues that the matter should be remanded for an award of benefits.  Defendant contends that the action should be remanded for further administrative proceedings "to allow an ALJ to consider Dr. Anderson's report." (Defendant's Motion, p.2)

"'[T]he decision whether to remand the case for additional evidence or to simply award benefits is within the discretion of the court.'" *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful." *Benecke,* 379 F.3d at 593 (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a

> determination of disability can be made; and (3) it is clear from the record that
> the ALJ would be required to find the claimant disabled were such evidence
> credited.

*Id.* (citations omitted); *see also McCartey,* 298 F.3d at 1076-1077 (remanding for award of

benefits where ALJ failed to consider evidence of disability in the record). Where the test

is met, "we will not remand solely to allow the ALJ to make specific findings...Rather we

take the relevant testimony to be established as true and remand for an award of benefits."

*Benecke,* 379 F.3d at 593 (citations omitted); *see also Lester,* 81 F.3d at 834 (same).

As to whether the ALJ "failed to provide legally sufficient reasons for rejecting the

[Plaintiff's] evidence," *Benecke,* 379 F.3d at 593,  Defendant concedes that "the ALJ did not

consider the August 16, 2002 report of Dr. Anderson."  (Defendant's Motion, p. 2)

Dr. Anderson treated Plaintiff since at least January, 2000.  (TR.  244-245) Dr.

Anderson's January 6, 2000 records reflect that Plaintiff complained of "neck pain–burning

discomfort–now radiating to [left] shoulder."  (TR. 244) Plaintiff stated that "vioxx helps"

and that the pain worsens with activity, including work.  (Id.)  Dr. Anderson reviewed 1999

diagnostic tests of Plaintiff's right shoulder and he ordered additional tests.  (TR. 245) He

found weakness in Plaintiff's left upper extremity and he diagnosed "cervical pain."  (Id.)

Additionally, Dr. Anderson referred Plaintiff to Dr. Gonzales-Portillo, a neurosurgeon.

(*see* TR. 240)  In April, 2000, Dr. Gonzales-Portillo advised Dr. Anderson that the "MRI of

the cervical spine...show[ed] a disc herniation on the left at C4/5 and C5/6."  (Id.)  Dr.

Gonzales-Portillo recommended that Plaintiff continue with physical therapy.  (Id.)

Plaintiff saw Dr. Anderson on February 8, 2002, when she complained of neck pain

and  numbness  in her face, neck, and  upper and lower extremities.  (TR. 340) Plaintiff was

taking Voixx,  OxyContin and Valium in addition to other medications, which included Paxil

for depression.  (Id.)  Dr. Anderson noted tenderness in Plaintiff's "C spine" and "L spine."

(Id.)  His diagnosis included: sensory disturbance, depression and anxiety.  (Id.)

On June 24, 2002, Plaintiff returned to Dr. Anderson.  (TR. 325) By this time, at least

one other neurosurgeon, Dr. Bernstein, had recommended surgery involving "a two level

- 20 -

anterior cervical discectomy, interbody fusion and internal fixation." (TR. 265) Plaintiff was unable to proceed with this surgery because "her insurance did not work with that surgeon." (TR. 275)

By her June 24, 2002 appointment with Dr. Anderson, Plaintiff had  previously returned to Dr. Gonzales-Portillo in February 2001 because her pain had become worse. (TR. 275 )  Dr. Gonzales-Portillo "reviewed her MRI of the cervical spine which show[ed] this L-sided herniated disc between 4/5, as well as central diffuse disc bulge at C5/6 and a small C6/7 disc herniation, but with deformation of the spinal cord."  (TR. 275) Because Plaintiff "has multiple risk factors including diabetes" Dr. Gonzales-Portillo recommended that she "exhaust the conservative therapy first."  (Id.)  Therefore, Dr. Gonzales-Portillo referred Plaintiff to a pain clinic.  (Id.)

Upon seeing Dr. Anderson on June 24, 2002, Plaintiff once again reported neck and shoulder pain.  (TR. 325) She was taking Valium and Vioxx in addition to several other medications.  (Id.)  She also indicated that she was "unable to cont[inue with] pt/water therapy...recent surgery–now back to swimming.  Worse [with] traction."  (TR. 325) Dr. Anderson reviewed Plaintiff's March 7, 2000 and May 22, 2002 MRIs. (Id.)  His diagnosis was: "cervical radiculopathy" and "lumbar pain." (Id.)  Thereafter, on August 16, 2002, Dr. Anderson determined that Plaintiff was limited to less than two hours of sedentary work per day.  (TR. 347)

Despite the fact that the ALJ must afford "greater weight...to a treating physician's opinion," than to the opinion of a non-treating physician, the ALJ failed to address Dr. Anderson's August 16, 2002 opinion. *Magallanes,* 881 F.2d at 751.  Instead, the ALJ agreed with the opinions of the state agency physicians, Dr. Krasner and Dr. Stagg, that Plaintiff could return to her past relevant work.  (TR. 20) The record reflects that Dr. Krasner saw Plaintiff once in October 2001 for a consultative examination at the request of the state agency.  (TR. 299-301) Dr. Stagg, whose opinion is dated October 30, 2001, did not examine Plaintiff at all.  (TR. 302-309) Dr. Krasner's and Dr. Stagg's opinions were rendered without

the benefit of the May 22, 2002 MRI showing: "[b]ulge[d] and degenerated disks at C5-C6 and C6-C7 without much progression since the last study"; that at C5-C6, the canal diameter was narrowed and C4-C5 had mild foraminal stenosis visible on the left; "a [s]mall disk bulge...at T10-T11 and T11-T12...[b]ulging disk with annular tear at T12-L1"; and spinal stenosis at L4-L5 with narrowed cross-sectional canal area.  (TR. 314-315)  Although Doctors Krasner and Stagg determined that Plaintiff  could work, they disagreed as to whether she could perform "medium" or "light" work.  (TR. 301, 302-309) Further, Dr. Stagg, who found that Plaintiff could perform only light work, also indicated that Plaintiff had a limited ability to reach in all directions on the right.  (TR. 305)

It is well-settled that the ALJ cannot reject a treating physician's opinion on the ultimate issue of disability "without presenting clear and convincing reasons for doing so." *Reddick,* 157 F.3d at 725 (citations omitted).  Moreover,  "[a] treating physician's opinion on disability even if controverted, can be rejected only with specific and legitimate reasons supported by substantial evidence in the record."  *Id.* (*citing Lester,* 81 F.3d. at 830).  By failing to address Dr. Anderson's August 16, 2002 Medical Work Tolerance Recommendations, the ALJ failed to provide *any* reason for rejecting that opinion.  By failing to provide any reason for rejecting Dr. Anderson's opinion and by instead relying upon the opinions of one doctor who examined Plaintiff only once and another doctor who had never examined Plaintiff, the record supports the conclusion that the ALJ failed "to provide legally sufficient reasons for rejecting the evidence."  *Benecke,* 379 F.3d at 593.

"Where the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, we credit that opinion as a matter of law." *Lester,*  81 F.3d at 834 (citation omitted). Dr. Anderson determined that Plaintiff was limited to performing less than two hours of sedentary work. (TR. 346-347) Dr. Anderson completed the Medical Work Tolerance Recommendations form over two years after he began treating Plaintiff.  Dr. Anderson's records reveal that over the years that he treated Plaintiff, he reviewed Plaintiff's diagnostic tests and referred her to Dr. Gonzales-Portillo, who in turn

referred her for physical therapy and to the pain clinic in an attempt to avoid surgery given Plaintiff's multiple risk factors. Accordingly, the record reflects that Dr. Anderson considered the comprehensive objective medical evidence in the record when arriving at his diagnosis and his determination regarding Plaintiff's ability, or in this case, her inability, to work.

Under the instant circumstances, there is no basis on which an ALJ, when crediting Dr. Anderson's findings, could conclude that Plaintiff retained an RFC that would enable her to perform substantial gainful work. Moreover, the inability to perform full-time sedentary work renders Plaintiff disabled under the Social Security Act. *See e.g., Reddick,* 157 F.3d at 729-730 (remanding for an award of benefits where, *inter alia,* the plaintiff was unable to work a full work week); SSR 96-8p (assessment of RFC includes consideration of an individual's ability to perform sustained activities eight hours a day, for five days a week, or an equivalent work schedule). Further, Dr. Anderson's disability finding predated the expiration of Plaintiff's insured status. (TR. 61); *See also Tidwell v. Apfel,* 161 F.3d 599, (9th Cir. 1999) (to be entitled to disability benefits the plaintiff must establish that her disability existed on or before the expiration of the date last insured). No outstanding issues must be resolved before a determination of disability can be made and for that reason, it is clear on the instant record that upon crediting Dr. Anderson's Medical Work Tolerance Recommendations, the ALJ would be required to find Plaintiff disabled and entitled to benefits. *See Benecke,* 379 F.3d at 593-595 (remanding for an award of benefits where no outstanding issues remain and ALJ would be required to find claimant disabled if evidence is credited); *Regennitter v. Commissioner,* 166 F.3d 1294, 1300 (9th Cir. 1999) (where the court "conclude[s] that...a doctor's opinion should have been credited and, if credited, would have led to a finding of eligibility, we may order the payment of benefits."); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990) (remanding for payment of benefits where the Secretary did not provide adequate reasons for disregarding examining physician's opinion);

*Winans,* 853 F.2d at 647 (same).   Accordingly, all three factors that the Court must consider support Plaintiff's request to remand the matter for an award of benefits.

The record also supports Plaintiff's position that the ALJ not only erred with respect to Dr. Anderson's findings, but also erred by discounting Plaintiff's credibility regarding pain and other limitations associated with her injuries.  "Unless there is affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be 'clear and convincing.'...General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints."  *Lester,* 81 F.3d at 834 (citation omitted).  Here, although the ALJ "realize[d] [Plaintiff]...has some shoulder, neck, and cervical spine [sic] pain," he found that  Plaintiff's "limitations are not as severe as alleged, they are only mild."  (TR. 20) The ALJ referred to Plaintiff's March  7, 2000 MRI which showed no evidence of radiculopathy. The ALJ also cited Plaintiff's visit to Dr. Halter who "noted that before surgical intervention, alternative options should be initiated." (TR. 20)

The record shows that Plaintiff consistently complained of progressively worsening pain and numbness associated with her shoulder, neck, and spine.  Moreover, medical records including MRIs performed on March 7, 2000 and May 22, 2002, provide objective support for Plaintiff's complaints.   In fact, subsequent to the March 2000 MRI, Dr. Bernstein recommended surgery. (TR. 265) Further, Dr. Gonzales-Portillo did not dismiss the fact that Plaintiff may ultimately need surgery; he merely wanted to "exhaust the conservative therapy first" because Plaintiff suffered from "multiple risk factors," including diabetes, that made surgery a less desirable option. (TR. 275) Indeed, to any extent that the ALJ relied on Dr. Halter's discussion of "alternative options" before surgical intervention, the ALJ overlooked the fact that Dr. Gonzales-Portillo referred Plaintiff to Dr. Halter for the very reason that Dr. Gonzales-Portillo hoped to avoid surgery given Plaintiff's diabetes and other risk factors. (TR. 275)   Additionally, even Dr. Stagg, a state physician, determined that Plaintiff was limited in her ability to reach in all directions with her right arm (TR. 305), which supports

Plaintiff's claims of pain performing her past relevant work that required her to reach out to type.  The record also shows that Dr. Anderson determined that Plaintiff's injuries rendered her unable to complete a full day of sedentary work (TR. 346-347); such a determination supports  Plaintiff's statements that her pain rendered her unable to continue working.

The ALJ took Plaintiff's statements about her pain medication out of context as well. For example, the ALJ paraphrased Dr. Halter's report as follows:  "[t]he [Plaintiff] told Dr. Halter that she did not want to take any more pain medication.  She stated that she was taking medication only intermittently, one to two times a week at night, otherwise she did not need it.  Hence, Dr. Halter suggested the claimant could discontinue her OxyContin.  He noted it was not the medication of [choice]...for incidental pain."  (TR. 20) Although Plaintiff did indeed indicate to Dr. Halter that she did not wish to add any additional pain medications to the long list of medications that she was already taking, the ALJ overlooked that at the time Plaintiff saw Dr. Halter, Plaintiff was already taking up to ten medications, including Vioxx, OxyContin, and Tylenol #3.  (TR. 278)   That Dr. Halter advised Plaintiff to discontinue the OxyContin does not on this record undermine Plaintiff's credibility especially given that Dr. Halter recommended that Plaintiff continue with Tylenol #3, another pain medication.  (TR. 280) Dr. Halter's notes also indicate that Plaintiff suffered adverse reactions to the OxyContin as follows: "it was too sedating for her and she was unable to function for 'two days.'"  (TR. 278) Further, even though Plaintiff indicated to Dr. Halter that she "does not require pain medications on a daily basis," she also stated that "she may need [pain medication] up to several times a week at night."  (TR. 280) Dr. Halter stated that "[i]f the Tylenol #3 are effective for her, then this would be adequate coverage, however, you can titrate up to whatever immediate release medication that is effective for her as long as there is not a high load of Tylenol."  (Id.)   Consequently, in contrast to the ALJ's findings, the medical evidence in the record supports Plaintiff's statements regarding her pain.

## CONCLUSION

Plaintiff is currently 51 years of age and it has been over four years since she applied for benefits.  The Ninth Circuit has recognized that "[r]emanding a disability claim for further proceedings can delay much needed income for claimants who are unable to work and are entitled to benefits, often subjecting them to 'tremendous financial difficulties while awaiting the outcome of their appeals and proceedings on remand.'"  *Benecke,* 379 F.3d at 595 (*quoting Varney v. Secretary of Health and Human Services,* 859 F.2d 1396, 1398 (9th Cir. 1988); *see also Terry v. Sullivan,* 903 F.2d 1273 (9th Cir. 1990) (remanding for an award of benefits where the plaintiff applied almost four years prior); *Erickson v. Shalala,* 9 F.3d 813 (9th Cir. 1993) (remanding for an award of benefits where plaintiff, who was disabled under the Act, "ha[d] been waiting for well over four years for his disability benefits").  On the instant record where the ALJ failed to consider the opinion of Plaintiff's treating physician and where Plaintiff has satisfied all three factors in favor of a remand for an award of benefits, "[r]emanding for further administrative proceedings would serve no useful purpose and would unnecessarily extend...[Plaintiff's] long wait for benefits."  *Benecke*. 379 F.3d at 595.  Therefore, Plaintiff's Motion for Summary Judgment should be granted and this matter should be remanded for an award of benefits.

## RECOMMENDATION

For the foregoing reasons,  the Magistrate Judge recommends  that the District Court, after its independent review, deny Defendant's Motion for Remand (Doc. No. 15), grant Plaintiff's Motion for Summary Judgment (Doc. No. 9) and remand this action for an award of benefits.

/ / /

/ / /

/ / /

/ / /

/ / /

Pursuant to 28 U.S.C. §636(B), any party may serve and file written objections within ten days after being served with a copy of this Report and Recommendation.  If objections are filed, the parties should use the following case number: CIV 04-393-TUC-CKJ.

DATED this 26th day of August, 2005.

_____
Héctor C. Estrada
United States Magistrate Judge